IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MARIAN C. SCHULTZ,

        Plaintiff,

v.                                CASE NO.  3:06cv442/RS/MD

THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF WEST FLORIDA,

        Defendant.
_____/

## ORDER ON DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

        Before me are Defendant's Motions for Partial Summary Judgment on Plaintiff's Failure to Promote Claims and Discriminatory Pay Claims (Docs. 38 & 39.)

### I.  FACTS

        Plaintiff Marian Schultz, an associate professor in the Department of Business Management at the University of West Florida, sues her employer, The Board of Trustees of the University of West Florida ("University"), for employment discrimination on the basis of sex.  Plaintiff contends that the University wrongfully rejected her application for promotion to the position of full professor and paid her a lower salary than her male counterparts.  Plaintiff brings suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes ("FCRA"); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"); the Florida Educational Equity Act, Chapter 1000, Florida Statutes ("FEEA"); and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA").

        On May 21, 2007, and May 30, 2007, I granted the University's motions for partial summary judgment on Plaintiff's Title IX and FEEA claims and dismissed those claims with prejudice, respectively.  (Docs. 43 & 53.)  Pending are the University's motions for partial summary judgment on Plaintiff's failure to promote and discriminatory

pay claims arising under Title VII, the FCRA, and the EPA (Docs. 38 & 39.)

The University contends that summary judgment in its favor is warranted on the failure to promote claim because Plaintiff has failed to establish a prima facie case of sex discrimination; the University has articulated legitimate, non-discriminatory reasons for its decision not to promote Plaintiff to the position of full professor; and Plaintiff has failed to demonstrate that the University's articulated reasons for denying her the promotion were pretexts for discrimination.  The University also urges dismissal of Plaintiff's discriminatory pay claim, contending that Plaintiff has failed to establish a prima facie case of discriminatory pay under the EPA because she cannot identify a similarly situated male faculty member who is paid more than she is paid and that any differences in pay among professors at the University are caused by factors other than sex.  Plaintiff filed responses to both motions (Doc. 55.)

## II.  DISCUSSION

### A. The Summary Judgment Standard

Under Fed. R. of Civ. P. 56(c), summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  A factual dispute is "'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law."  Anderson, 477 U.S. at 248; Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).

The basic issue before the court on a motion for summary judgment is "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

**B.  Failure to Promote**

Plaintiff alleges that the University discriminated against her on the basis of sex when it denied her application for promotion.  Plaintiff's failure to promote claim is brought under Title VII and the FCRA.

As a preliminary matter, I note that the analysis which governs Plaintiff's Title VII claim is the same analysis which governs her FCRA claim.  See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII"); Stevens v. Steak n Shake, Inc., 35 F. Supp. 2d 882, 886-87 (M.D. Fla. 1998) (applying Title VII elements to case arising under FCRA); The Florida State Univ. v. Sondel, 685 So. 2d 923, 925 (Fla. 1st DCA 1996) ("Federal case law interpreting Title VII . . . is applicable to cases arising under the Florida Act") (citation omitted); Florida Dep't of Comty. Affairs v.

Bryant, 586 So. 2d 1205, 1208 (Fla. 1st DCA 1991).  Thus, if dismissal of Plaintiff's claim is warranted under Title VII, dismissal is also appropriate under the FCRA. Harper, 139 F.3d at 1387 ("No Florida court has interpreted the Florida statute to impose substantive liability where Title VII does not.")

Plaintiff concedes that she has no direct evidence of discrimination and that the three-tier test enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 668 (1973) and refined in Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) governs the analysis.  See Byrd v. Lakeshore Hosp., 30 F.3d 1380, 1383 (11th Cir. 1994) (Doc. 55:4.)  Under the McDonnell Douglas paradigm, a plaintiff alleging unlawful discrimination is required to first establish a prima facie case that creates a rebuttable presumption of unlawful discrimination.  McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Burdine, 450 U.S. at 252-53, 101 S. Ct. at 1093, 67 L. Ed. 2d at 252.  "The plaintiff's burden of establishing a prima facie case serves, in part, to assure that the plaintiff has some competent proof that she was treated differently than similarly situated employees." Lang v. Star Herald, 107 F.3d 1308, 1312 (8th Cir. 1997).

If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  Finally, if the employer articulates some legitimate, nondiscriminatory reason for the employee's rejection, the plaintiff must demonstrate that the employer's stated reason for rejecting her was merely a pretext for discriminating against her.  Id. at 804; 93 S. Ct. at 1825.  Despite the shifting burdens of proof, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253, 101 S. Ct. at 1093.

### 1.  McDonnell Douglas Step One:  The Prima Facie Case of Discrimination

A plaintiff may establish a prima facie case of discrimination in a promotional decision by demonstrating that she (1) is a member of a protected class; (2) was

qualified and applied for the promotion; (3) was rejected for the promotion despite her qualifications; and (4) other equally or less qualified employees who are not members of the protected class were promoted.  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005); Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). Plaintiff has failed to satisfy the second and fourth requirements of the prima facie case.

### a. Qualified for the Promotion

As a threshold matter, I note that the analysis governing whether a plaintiff is "qualified" for purposes of establishing a prima facie case in a failure to promote claim differs slightly from the analysis governing whether a plaintiff is "qualified" for purposes of establishing a prima facie case in a discriminatory discharge claim.  In discriminatory discharge cases, the Eleventh Circuit has stated that a plaintiff has satisfied the "qualified for the position" prong of the prima facie case when she has been employed in that position for a significant period of time.  See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999); Pace v. Southern Railway Sys., 701 F.2d 1383, 1386 n. 7 (11th Cir. 1983).  Where a plaintiff has held a position for a significant period of time, it is logical to infer that the plaintiff's experience "qualifies" her for the position from which she was terminated, at least at the prima facie stage of the analysis.  Young v. General Foods Corp., 840 F.2d 825, 830 n. 3 (11th Cir. 1988) (citing Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1495 n. 2 (11th Cir. 1987)).

In cases alleging failure to *promote*, however, decisional authorities have not acknowledged the same inference.  A plaintiff alleging discrimination in a promotional decision, unlike a plaintiff alleging unlawful termination from a position already held, carries the burden of establishing that she is indeed qualified for the increased responsibility, acknowledgment, status, and pay that flow from the promotion.  In other words, the positive change of position which accompanies the promotion or new position, unlike the negative change of position associated with a discharge from a position already held, requires that a plaintiff sufficiently justify that she is indeed *entitled* to the *reward* that is the promotion.  The Eleventh Circuit has stated that a plaintiff may establish that she was qualified for a promotion by satisfying the employer's objective

qualifications for the promotion.  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005).

Here, the parties do not dispute that to qualify for promotion to full professor, the applicant must demonstrate that she has attained a sufficient degree of recognition in her field outside the University.  Plaintiff has failed to sufficiently demonstrate that she has satisfied that requirement.

I may be justified in assuming for purposes of discussion only that Plaintiff has satisfied the "qualifications" prong of the prima facie case inasmuch as Plaintiff contends that the faculty evaluations which resulted in the denial of the promotion were themselves discriminatory.  See Sledge v. Goodyear Dunlop Tires North America, Ltd., 275 F.3d 1014, 1019 (11th Cir. 2001) (fact that plaintiff failed written examination did not establish that he was unqualified for position where exam itself was simply claimed a pretext for discrimination); Casiano v. Gonzales, 2006 U.S. Dist. LEXIS 3593, *40-*42 (N.D. Fla. 2006) ("since the denial of privileges was based on peer reviews that Casiano contends were themselves discriminatory, it would be inappropriate to treat those reviews as positively establishing that Casiano was unqualified for his job as Clinical Director").  I followed that approach in Scarborough v. Mineta, 2006 U.S. Dist. LEXIS 18218, *17-*18 (N.D. Fla. 2006) ("Because Scarborough was terminated from training based on evaluations which Scarborough contends were themselves unlawfully discriminatory, it would be inappropriate to treat the evaluations as positively establishing that Scarborough was unqualified for the position").

If I were to assume for purposes of discussion only that Plaintiff were qualified for the promotion at the prima facie stage, I would simply assess the true viability of her claims of discrimination at the legitimate, nondiscriminatory and pretextual stages of the analysis.  In this case, however, I have good reasons to disregard that approach.

The cases which have glossed over the "qualifications" prong of the prima facie case involved allegations of discriminatory discharge, not allegations of discrimination in the promotional process.  More importantly, Plaintiff's response to the motion makes no attempt to even establish a prima facie case of discrimination.  In addressing her

qualifications, Plaintiff contends, in an ambiguous and conclusory manner, that

> [s]he was objectively qualified for promotion to full professor.
> . . . Specifically, UWF did not follow their [sic] own published
> promotion standards; a higher standard was applied to Schultz
> than what was applied to male applicants that [sic] were
> promoted; and, inconsistent and conflicting peer evaluations
> were considered throughout the promotion process.
> Additionally, during plaintiff's employment, ninety one percent
> of male applicants were promoted to full professor, while only
> twenty five percent of female applicants were promoted.

(Doc. 55:5-6.)  Plaintiff concludes that "[c]learly, she has established a prima facie

case."  (Doc. 55:6.)

　　　This cursory and conclusory treatment of the prima facie case is undeserving of

assumptions regarding Plaintiff's qualifications for promotion.  To permit a plaintiff to

flippantly treat the requirement that she first produce at least *minimal* competent proof

that she is *entitled* to a promotion and then leapfrog to the second step of the

McDonnell Douglas analysis would be unjust.  A plaintiff who has not been terminated

from her position but who seeks a promotion must not be permitted to circumvent the

three-step McDonnell Douglas framework by snubbing one-third of its requirements.

　　　In this case, Plaintiff trumpets the allegedly discriminatory practices committed by

the University.  This effort has no bearing on Plaintiff's *qualifications*.  Identifying such

practices is indeed appropriate later in the McDonnell Douglas analysis which requires

an assessment of whether the University's stated reasons for denying Plaintiff's

application were legitimate and non-discriminatory or pretexts for discrimination.  Here,

however, Plaintiff's argument, when reduced to its basic form, reads:  The promotion

process is unfair; therefore, I should be promoted.  The prima facie stage of the

McDonnell Douglas analysis is not so one-sided.  Plaintiff has made no effort to marshal

evidentiary support for her qualifications.

　　　John Cavanaugh, the president of the University, made an identical observation.

In his memorandum opinion in which he denied Plaintiff's request for promotion,

Cavanaugh stated that he had reviewed Plaintiff's initial dossier, statements by

department faculty, Chair, Dean, university committee, Provost, additional documents

provided by Plaintiff, report from the Interim General Counsel concerning allegations of gender discrimination, and Plaintiff's rejoinders to the reviews and documents and that he had conversed with personnel regarding Plaintiff's claim of gender discrimination.  In concluding that "the evidence presented does not warrant promotion to Professor in my judgment," Cavanaugh emphasized that "[i]n submitting one's record for consideration for promotion to professor, it is critical that the candidate present as strong a case as possible to document achievement in the various areas of review"; that "it is the candidate's responsibility to present the best case possible for tenure and/or promotion"; and that "[b]uilding the strongest case for promotion, . . . should, in my view, be something any candidate would choose to do" (Doc. 46, Exh. B.)  Cavanaugh acknowledged that Plaintiff had "provided such evidence in the area of teaching . . . and service" but that Plaintiff had not "unequivocally establish[ed] that [her] work has had an impact on the field (external recognition)." (Doc. 46, Exh. B.)

Based on the evidence submitted, I agree with Cavanaugh's assessment.  While it is undisputed that Plaintiff is an exceptional teacher, promotion to full professor does not rest on teaching skill alone.  The criteria for promotion to full professor *require* that Plaintiff demonstrate "external recognition outside the University" in her academic field.  Such external recognition may be reflected in the applicant's "scholarly activity" or "substantive service to an external organization in the field."

Plaintiff attempted to demonstrate external recognition, in part, by submitting along with her application two letters of recommendation from academicians outside the University.  Plaintiff's choice of recommenders, however, is perplexing.  Although Plaintiff is an associate professor in the field of business management, she submitted letters of recommendation from a professor of sociology at the University of Tampa and an associate dean at Embry-Riddle, an aeronautical university.  The associate dean holds a doctoral degree in higher, adult, and professional education.  Neither of these individuals works in the field of business management.

Plaintiff largely relies on the analysis of her work by Dr. Arup Mukherjee, the chair of the business management department in which Plaintiff works, to establish her qualifications for promotion.  Although Dr. Mukherjee recommended Plaintiff for

promotion, he nevertheless acknowledged that "[t]hese external referees do not appear to have adequate background in the field of Management to evaluate the candidate's scholarly contribution to the field of Management.  Thus, I am unable to comment on external recognition of scholarly activity."  (Doc. 47, Exh. C.)

Plaintiff dismisses Mukherjee's conclusion and contends that the fields of psychology, sociology, and education are "supporting fields of interest" and that "[a]lmost every management and organizational textbook opens up with the chapter indicating the integration of the fields." Plaintiff, however, blinds herself to the dearth of relevant *content* concerning her qualifications that is absent from the two letters.

As noted by Cavanaugh, the recommenders did not place Plaintiff's work in the broader context of the field in which she works; did not discuss the overall impact of her work on the field; did not discuss the degree to which Plaintiff's work has influenced others or opened new avenues of teaching or scholarship; did not distinguish Plaintiff's work at a level one would expect for a professor; and did not show evidence of long-term, increasing activity and responsibility within the profession or professional organization that accrue with rising recognition in the field.  Thus, even if the backgrounds of the writers are extricated from consideration, the actual *substance* of the recommendations falls short of establishing the external recognition necessary to qualify Plaintiff for the promotion.

Yet Plaintiff complains that she also submitted letters from "NASA's contractor, the United Space Alliance, a Boeing-Lockheed Martin joint venture company, and the prime contractor for the space shuttle."  Plaintiff asserts that "[t]hese letters discuss the proprietary research which I worked on with these individuals, and instead of viewing this as a positive, it is overlooked entirely."  Plaintiff *again* overlooks *her* responsibility to convey how these letters demonstrate the appropriate external recognition in the field of business management.

Consistent with Plaintiff's apparent lack of focus, several faculty at UWF, male *and female*, opined that Plaintiff had not achieved the external recognition of scholarly activity required for promotion because some of her published articles did not

sufficiently relate to the field of business management.  University standards for promotion require that applicants demonstrate "very substantial tangible and public contributions <u>to the profession</u>." (Emphasis added.)  Even Dr. Mukherjee, who ultimately supported Plaintiff's application for promotion, noted that Plaintiff "has many publications outside the field of Management."  (Doc. 47, Exh. C.)  Many of those publications relate to the field of aviation and aeronautics.

Mukherjee concluded that Plaintiff had satisfied the minimum criteria necessary for promotion only after he tediously analyzed Plaintiff's publications in an appendix to his recommendation.  Even then, Dr. Mukherjee concluded that Plaintiff met only "the departmental <u>minimum</u> standards for promotion to full professor."  (Doc. 47, Exh. C.) (Emphasis added.)  According to Plaintiff, Dr. Mukherjee's painstaking analysis justifies a promotion:

> After working with Dr. Mukherjee on other committees, I have found that his attention to detail is part of his effective management style.  I would have thought that his scrutiny and overall analysis would have been considered by the personnel committee, and yet, his input seems to have been overlooked.

Beauty, however, is apparently in the eye of the beholder.  To an objective observer, Plaintiff's prospects for promotion were dismal at best when her primary recommender - the department chair - was forced to "scrutinize" her publications in order to justify his conclusion that Plaintiff had satisfied the bare-bones, "minimum" standards for promotion.  Plaintiff apparently ignores reality when she positively associates "scrutiny" and "minimum standards" with "promotion."

Plaintiff, however, alternatively suggests that she has demonstrated the required "external recognition" through "substantive service to an external organization in the field."  Plaintiff notes that "Dr. Cavanaugh completely failed to address Dr. Schultz's evidence of 'substantive service to an external organization related to you [sic] field.'" . . . He simply failed to follow the published standards."  (Doc. 55:55:14.)

Again, I find Plaintiff's criticisms to be misplaced.  Nowhere in Plaintiff's response to the motion does *Plaintiff* attempt to convey how *she* has satisfied the requirement of

"substantive service to an external organization in the field."  Instead, Plaintiff again chastises the actions or omissions of others and treats the prima facie case in a cursory fashion, completely ignoring the requirement that she first prove that she has satisfied her employer's objective requirements for promotion.  See Vessels, 408 F.3d at 769.  Without first establishing that she has "substantively" served an external organization in the field,  Plaintiff essentially places "the cart before the horse" by prematurely discussing her allegations of discrimination.

Plaintiff's service to external organizations is lacking.  The evidence is undisputed that since joining the University in 1989, Plaintiff has never held an office in any external organization in her field, nor has she served more than three years in any one external organization in the field.  In contrast, Dr. Diana Page, a female and one of two applicants promoted to the position of full professor in Plaintiff's department since 1989, had participated in a national business organization for numerous years and had risen to the level of vice president.  The other applicant promoted to full professor, Dr. Mukherjee, had served as a consulting and guest editor for a business journal for three years, a member of the editorial advisory board and reviewer of a journal for a total of ten years, a reviewer of a separate journal for four years, a conference reviewer of a journal for eight years, and a conference reviewer for a business organization for four years.  Although Plaintiff demonstrates that she has served various external organizations in her field in various capacities, the University found that Plaintiff lacked the "*substantive*" service required by the promotional criteria.

Even female reviewers of Plaintiff's application voted to deny Plaintiff the promotion.  Dr. Gayle Baugh, a female and associate professor in Plaintiff's department, stated in her affidavit that she voted against promoting Plaintiff because some of Plaintiff's published work was out of field; Dr. Baugh was not convinced that satisfying the minimum standard was sufficient to justify promotion to full professor; Plaintiff failed to convey how she had satisfied the minimum standards; some of Plaintiff's published work was not at the quality expected of a full professor; and Plaintiff had not served in a leadership role in an external organization, nor had she participated on an editorial board or reviewed scholarly work for journals.  (Doc. 40, Exh. B.)

Dr. Chula King, a female and chair of the Department of Accounting and Finance in the Department of Business, stated that Plaintiff contacted her and requested that she write a letter of recommendation to accompany Plaintiff's application for promotion to full professor.  Dr. King stated that she analyzed Plaintiff's curriculum vitae and concluded that Plaintiff had not met the scholarship criteria required by Plaintiff's department for promotion to full professor.  Dr. King observed that most of Plaintiff's publications were in aeronautical journals and were unrelated to Plaintiff's discipline.  In addition, Dr. King stated that Plaintiff failed to indicate how her publications satisfied the minimum criteria required by Plaintiff's department.  Dr. King therefore did not write Plaintiff a letter of recommendation.  Interestingly, Dr. King, herself, was denied promotion to full professor on her first attempt.  She stated in her affidavit that

> While I was upset at being turned down for professor, I accepted the decision.  I applied for promotion to professor the following year and this time, my application was successful . . . Because of the physical and emotional energy involved in putting together a promotion portfolio, I would suspect that most, if not all, people who go up for promotion feel that their record justifies a favorable result.  In my own case, I felt that I had met the criteria for promotion to professor the first time I applied.   I therefore understand first-hand the negative emotions that result from being turned down for promotion.  I also know first-hand how difficult it is to vote against a colleague's bid for promotion.  I have served once on the College Personnel Committee and am currently serving on the University Personnel Committee.   In both cases, the Committees' members wrestled with and sometimes anguished over a negative vote.  In the end, however, I felt that the applicants were treated fairly and were judged on the basis of their record and not for any other purpose including gender.

(King Aff., Doc. 40, Exh. C.)

Dr. Sandra Flake, a female and the University's provost, also did not recommend Plaintiff for promotion.  Dr. Flake stated that

> After careful consideration, I recommend against promoting [Plaintiff] to the rank of Professor in the Department of Management and Management Information Systems in the College of Business . . . I have chosen not to recommend [Plaintiff] for promotion because I have not been fully

> convinced that her record justifies disputing the recommendations of her Dean and the two Personnel Committees.

(Doc. 51, Exh. 23.)

Finally, it is undisputed that the ultimate decision of whether to promote an applicant rests with the president of the University.  Plaintiff does not contend that President Cavanaugh, individually, acted with discriminatory animus toward her when he rejected her application for promotion; rather, Plaintiff contends that the promotional process itself was discriminatory and that President Cavanaugh *relied* on tainted faculty evaluations arising from that process when he denied her application.  Plaintiff asserts that "courts will not blindly accept the titular decisionmaker as the true decisionmaker"; "employers may not insulate themselves from Title VII claims simply by ensuring that the one who performed the employment action was isolated from the employee"; and that "in order to escape liability, the employer must demonstrate that it conducted an independent investigation of the facts, rather than relying on the recommendation of the biased subordinate."  (Doc. 55:13.)  Plaintiff complains that President Cavanaugh did not conduct an independent investigation of the facts.

Plaintiff's conclusion is baseless.  The record conclusively establishes that President Cavanaugh conducted independent investigations into both Plaintiff's qualifications and her claim of gender discrimination.  In his letter to Plaintiff, President Cavanaugh stated that he has "assisted many faculty during my career through tenure and promotion processes at several institutions" and that he has "served as an external reviewer as requested by departments and, in one case, by a court."  President Cavanaugh admitted that he has, in the past, "made final promotion decisions not in conformity with the Provost and/or the lower tiers of the seven tier [evaluation] process." (Cavanaugh Aff., Doc. 46:  ¶ 17.)  President Cavanaugh asserted that he was aware of Plaintiff's allegations of gender discrimination; ordered that an investigation be completed before he reviewed Plaintiff's application; and even held the promotion process in abeyance before rendering his decision in order to ensure that discrimination was not involved in the decisions made in the earlier evaluations.  (Cavanaugh Aff., Doc. 46: ¶ 31.)

An investigation report was prepared by the University's interim general counsel and submitted with the motions.  The report concluded that Plaintiff's allegations of discrimination were unsubstantiated.  (Cavanaugh Aff., Doc. 46: ¶ 32.)  Despite the report's conclusion that Plaintiff's allegations were meritless, President Cavanaugh nevertheless stated that

> I decided the best course of action was to evaluate [Plaintiff's] promotional dossier, independently and objectively, without regard to the recommendations submitted as part of the University seven-tier process.  Knowing that [Plaintiff] objected to some of the lower level decisions and voiced her concerns in her rejoinder letters caused me to make my own conclusions regarding her application for promotion even though the investigation could not corroborate [Plaintiff's] allegations. [Plaintiff's] very strong and very negative feelings about her peers in the Department of Management/MIS, the College of Business Personnel Committee and the University Personnel Committee played no role in my evaluation of her application for promotion.

(Cavanaugh Aff., Doc. 46: ¶¶ 32-34.)

After considering Plaintiff's portfolio and the promotional criteria, President Cavanaugh determined that Plaintiff met or exceeded the criteria for promotion to full professor in the areas of teaching and service.  (Cavanaugh Aff., Doc. 46: ¶¶ 35-36.) President Cavanaugh concluded, however, that Plaintiff had not satisfied the criterion of external recognition outside the University for the reasons already mentioned. (Cavanaugh Aff., Doc. 46:  ¶¶ 37-49.)  He acknowledged that

> [i]t is entirely plausible that [Plaintiff] has made very substantial tangible and public contributions to the Management profession measured by favorable acknowledgment in the discipline outside the University.   It is the candidate's responsibility to present as strong a case for promotion and to submit documentation supporting their promotion.   However, based upon the evidence submitted by [Plaintiff], in my opinion, the materials did not show proof of favorable acknowledgment in the discipline outside the University (external recognition).

(Cavanaugh Aff., Doc. 46: ¶ 45.)  Cavanaugh also determined that because the evidence presented by Plaintiff did not sufficiently establish external recognition, it was

difficult to evaluate whether Plaintiff had satisfied the fourth criterion of "strong record of scholarly and creative activities."  (Cavanaugh Aff., Doc. 46: ¶ 50.)

In summary, Plaintiff has failed to prove that she was qualified for the promotion to full professor.  In her response to the University's motions for summary judgment, Plaintiff fails to address her qualifications for purposes of establishing the prima facie case.  Instead, Plaintiff has not demonstrated the external recognition based on scholarly activity in the field or substantive service to an external organization in the field required for promotion.  Plaintiff's application improperly consists of letters of recommendation from individuals outside her field of business management.  The specific content contained within the letters of recommendation is irrelevant in that it fails to address the topic of external recognition.  Several of Plaintiff's publications were unrelated to her field of business management.  Plaintiff's primary recommender for the promotion and chair of her department, Dr. Mukherjee, concluded only after careful "scrutiny" that Plaintiff had satisfied the "minimum standards" for scholarship, hardly justifying a reasonable expectation of promotion.  Several female reviewers of Plaintiff's application concluded that Plaintiff was not qualified for promotion.

Plaintiff fails to demonstrate the "substantive service to an external organization" necessary to establish her external reputation.  Plaintiff held no leadership position in an organization, nor had she participated on an editorial board or reviewed scholarly work for journals.  The president of the University, John Cavanaugh, conducted an independent investigation and concluded that Plaintiff's claims of gender discrimination were unfounded.  President Cavanaugh also independently evaluated Plaintiff's application for promotion and determined that Plaintiff failed to sufficiently demonstrate that she had attained the qualifications necessary for promotion to full professor.

### b.  Promotion of Similarly-Situated, Non-Class Member

Plaintiff also fails to satisfy the fourth requirement of the prima facie case, the promotion of a similarly-situated, non-class member.  In order to meet the comparability requirement, a plaintiff must demonstrate that she is similarly situated in all relevant aspects to the non-minority employee.  Silvera v. Orange County Sch. Bd., 244 F.3d

1253, 1259 (11th Cir. 2001).  In cases involving claims of differential treatment in the disciplinary context, it is well settled that the comparator's conduct must be nearly identical to plaintiff's "in order to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges."  Maniccia v. Brown, 171 F.3d 1364, 1368-69 (citing Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples")).  I find no just cause to depart from this reasoning simply because this case involves the employer's denial of a promotion rather than the employer's imposition of discipline.

Here again, Plaintiff's response and the evidence fall short of establishing her prima facie case.  Plaintiff fails to even identify a similarly-situated, non-class member who was promoted.  Plaintiff asserts only conclusory and vague allegations that a greater percentage of male applicants than female applicants have been promoted to full professor and that a female professor and advocate for Plaintiff, Dr. Diana Page, did not believe that male faculty members, Dr. Ron Gray and Dr. Richard Sjolander, were qualified for their promotions to full professor.  Plaintiff does not, however, substantively analyze how any of these male applicants qualifies as a fair congener for purposes of establishing her prima facie case.  Beyond her bare bones assertions of a percentage and the names of two male professors, Plaintiff attempts no more.  Plaintiff might just as easily have achieved the same nugatory effect by substituting the names John Doe I and John Doe II for Dr. Ron Gray and Dr. Richard Sjolander.  See Malladi v. Brown, 987 F. Supp. 893, 910 (M.D. Ala. 1997) ("The simple allegation that there was someone else, without an adequate showing that [he] is similarly-situated in all relevant respects, fails to make out the prima facie case").

I can discern from the record only one potential similarly-situated individual.  The only male associate professor in Plaintiff's department who was promoted to full professor since 1989, the year in which Plaintiff began her employment at the University, is Dr. Arup Mukherjee, the current chair of the department.  Dr. Mukherjee, however, is not similarly situated to Plaintiff.

President Cavanaugh was president of UWF when Dr. Mukherjee applied for promotion from associate to full professor.  President Cavanaugh stated in his affidavit that unlike Plaintiff, Dr. Mukherjee's application demonstrated the external recognition in his field necessary for promotion.  Dr. Mukherjee submitted three letters of recommendation, all from peers outside the University who worked in the field of Management.  The content of the letters, unlike the content of the letters submitted by Plaintiff, addressed the issues favorable to a determination that Dr. Mukherjee had achieved the external recognition in his field necessary to justify his promotion.  In addition, as discussed previously, Dr. Mukherjee's service to external organizations in his field was far more substantial than Plaintiff's service.

Finally, the supervisors and reviewers of Plaintiff's application were different from the supervisors and reviewers who evaluated Dr. Mukherjee's application.  This factor is critical in undermining Plaintiff's contention that a similarly-situated, non-class member was promoted.  "To be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor and been subject to the same standards."  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Evaluating an application for promotion is inherently subjective.  While one supervisor may judge a candidate's application positively, another may offer a negative evaluation.  This is particularly true when a candidate, like Plaintiff, has mixed qualifications.

In this case, Dr. Mukherjee's supervisor at the time of his application for promotion was obviously a different individual than Plaintiff's supervisor at the time of her application, who was Dr. Mukherjee himself.  In addition, the various committees reviewing Plaintiff's application were composed of different members than the committees which had reviewed Dr. Mukherjee's application.  Based on these differences in evaluators and Plaintiff's failure to identify a legitimate comparator, Plaintiff fails to establish that a similarly-situated, non-class member was promoted.

### 2. **McDonnell Douglas** Step Two: Employer's Legitimate, Nondiscriminatory Reason

Because Plaintiff has failed to establish a prima facie case of discrimination, I am not required to consider the second and third steps in the McDonnell Douglas analysis, that is, whether the University has articulated a legitimate, nondiscriminatory reason for rejecting Plaintiff's application and whether that stated reason is a pretext for discrimination. Nevertheless, I will address those components.

In articulating a legitimate, nondiscriminatory reason for rejecting an employee, the defendant's burden is "exceedingly light." Perryman v. Johnson Prods. Co. Inc., 698 F.2d 1138, 1142 (11th Cir. 1983) (citing Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094). "The defendant only needs to produce evidence of a reason for its decision; it does not need to prove that it was actually motivated by that explanation." Sermons v. Fleetwood Homes of Georgia, 227 F. Supp. 2d 1368, 1380 (citing Burdine, 450 U.S. at 254, 101 S. Ct. at 1094). The defendant's burden at this stage of the analysis is "merely one of production, not of proof." Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982). "As long as the defendant articulates its reason with some specificity so that the plaintiff has a 'full and fair opportunity to demonstrate pretext,' the defendant's burden has been met." Sermons, 227 F. Supp. 2d at 1380 (quoting Burdine, 450 U.S. at 255-56, 101 S. Ct. at 1095).

For the reasons already discussed in my analysis of the prima facie case, the University has satisfied its burden on this step of the analysis. It has articulated legitimate, nondiscriminatory reasons for denying Plaintiff the promotion. The University contends that Plaintiff did not demonstrate the external recognition based on scholarly activity in the field or substantive service to an external organization in the field required for promotion.

### 3. **McDonnell Douglas** Step Three: Pretext

"Once a defendant offers a legitimate, nondiscriminatory reason for its actions, the plaintiff must attack that reason 'head on and rebut it' so as to show that the reason is really pretext for discrimination." Sermons, 227 F. Supp. 2d at 1381 (quoting

Chapman v. Al Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).  Pretext can be established by evidence which "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994).  Stated differently, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 256, 101 S. Ct. at 1095).  The proffered explanation is unworthy of belief if the plaintiff demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder" could disbelieve it.  Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)) (citation and internal quotation marks omitted).

In order to prove pretext, the plaintiff may offer "direct evidence of discrimination in the form of statements and admissions or by circumstantial evidence in the form of comparative or statistical evidence."  Woody v. St. Clair County Comm'n, 885 F.2d 1557, 1560 (11th Cir. 1989) (citing Miles v. M.N.C. Corp., 750 F.2d 867, 870 (11th Cir. 1985)).  The plaintiff may also establish pretext by showing that the employer did not rely on the proffered explanations for its actions.  See Israel v. Sonic-Montgomery FLM, Inc., 231 F. Supp. 2d 1156, 1162 (M.D. Ala. 2002) (citing Chapman, 229 F.3d at 1024).

The evidence fails to support Plaintiff's contention that the University's reasons for denying her the promotion were pretexts for discriminating against her.  I first consider the context in which the promotion was sought.  Plaintiff applied for promotion to the position of full professor at a university.  Faculty positions and promotional opportunities at universities, including UWF, are highly competitive.  Where, as here, Plaintiff seeks the *ultimate* academic promotion - promotion to full professor - one can hardly quibble with the University's requirement that Plaintiff unequivocally demonstrate that her work is worthy of such an honor.  Full professors are highly esteemed in the

academic world.  A candidate who seeks to attain this badge of merit obviously should not content herself with resting on the laurels of a recommendation by a department chair who, although ultimately recommending her for the promotion, concludes that she has satisfied only the "minimum" requirements or has produced insufficient information which prevents him from making certain conclusions about her qualifications.  Thus, while a promotion may naturally and proximately flow from satisfying the minimum requirements in certain fields, an applicant for full professor in a university setting surely should expect more rigorous scrutiny of her qualifications.

Also working to Plaintiff's disadvantage in this process are her academic credentials, the classes she teaches, and her research interests.  Unlike most other faculty members in her department and in the College of Business, Plaintiff holds a Doctor of Education (Ed.D.) rather than a Doctor of Philosophy (Ph.D.) in business.  Her doctorate is in the field of education, not in the field of business.  Plaintiff is permitted to teach business classes because she holds a master's degree in a business field.  Dr. Chula King, a female and professor of accounting and finance at the University, stated in her affidavit that "[i]n fact, I doubt that someone with an Ed.D. would even be considered for a position in UWF's College of Business today."  (King Aff., Doc. 40, Exh. C., ¶ 14.)

In addition, Plaintiff is qualified to teach only foundational, introductory level management classes.  In contrast, other professors in Plaintiff's department are qualified to teach the more specialized business subjects involving computers, mathematics, and science.

Finally, faculty were concerned that Plaintiff is something of a maverick in the academic business world in terms of her primary research interest:  aviation and aeronautics.  Thus, although Plaintiff, consistent with her background and credentials, is an excellent teacher, several faculty members at the University concluded that the recognition earned and contributions by Plaintiff to the field of business were insufficient to justify promotion to full professor.

A jury would have no basis to infer otherwise.  The promotional process at UWF

involves seven levels of review, beginning with the departmental faculty and followed by the chairperson of the department; the college faculty; the dean of the college; the university faculty; the provost; and finally, the President of the University.  Plaintiff's application was rejected at five of the seven levels and by faculty members of both sexes.

The promotional criteria are subjective and require complex evaluations and judgments by highly educated professionals.  It is often true that when summoned to evaluate the work of their colleagues, faculty disagree.  The evidence is undisputed that It is not unusual for a faculty member to be denied a promotion in one year and then re-apply at a later time with an improved portfolio before being promoted to full professor. Both male and female applicants have been rejected on their first attempts.  Plaintiff is no exception.  Plaintiff has completed the entire promotional application process only once.[1]

Plaintiff attempts to demonstrate pretext by highlighting the alleged unfairness in the promotional process.  For example, Plaintiff contends that the University did not follow its own published promotion standards; that inconsistent and conflicting peer evaluations were considered throughout the promotion process; that some faculty were given credit for publications in certain journals while Plaintiff was denied credit for publications in those same journals; that various faculty were not aware of Plaintiff's accomplishments at other campuses when they evaluated her; that faculty members "conferred amongst each other" or "conspired" to give Plaintiff low marks; that some evaluators replaced the department promotion standards with their own standards; that certain faculty were promoted who should not have been promoted; and that the criteria for promotion were ambiguous and created interpretive difficulties.

These contentions are, however, largely irrelevant for purposes of establishing a viable claim under Title VII.  "Title VII is not a shield against harsh treatment at the workplace."  Jackson v. City of Killeen, 654 F.2d 1181, 1186 (5th Cir. 1981).  The statute does not require the employer to have good cause for its decisions.  Nix v.

---

[1]Plaintiff submitted but withdrew her application a year earlier.

WLCY Radio/Rahall Comm'ns, 738 F.2d 1181, 1187 (11th Cir. 1984).  In fact, an employer may act adversely toward an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Id. (citing Megill v. Bd. of Regents, 541 F.2d 1073, 1077 (5th Cir. 1976)).  The Eleventh Circuit has been clear that "[i]t is not the job of the federal courts to second-guess employer decisions as a kind of super-personnel department." EEOC v. Total Sys. Servs., 221 F.3d 1171, 1176 (11th Cir. 2000) (citing Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999)).  "[Courts] are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon, 196 F.3d at 1361.

Thus, Plaintiff's contention that the promotional process is unfair is a red herring. The only relevant question is whether such alleged unfairness resulted *because Plaintiff is female*.  Plaintiff has introduced no evidence that she was treated differently than any other applicant, male or female, in the promotional evaluation process.  As already noted, most applicants for full professor are denied promotions on their first attempts. Plaintiff is no exception.  In addition, evaluations by the male faculty who Plaintiff contends discriminated against her contained positive comments.  Although finding that Plaintiff's progress on the external recognition and scholarship requirements for promotion was wanting, these male faculty nevertheless acknowledged that Plaintiff's teaching skills are unparalleled and even "legendary."

On their face then, the evaluations were not so one-sided and damning as to raise suspicion of an improper motive or call into question the candor and honesty of the evaluator.  Further, because the record consistently demonstrates that numerous individuals, male and female, questioned Plaintiff's qualifications for promotion, the lukewarm to critical evaluations of Plaintiff's work appear legitimate and non-pretextual. The only reasonable inference to be drawn from the evidence is that Plaintiff was denied the promotion because of legitimate, non-discriminatory, and non-pretextual reasons that were unrelated to her sex.

In forming this conclusion, I also note that Plaintiff misreads the significance of several of the facts on which she relies.  First, Plaintiff supports her claim of discrimination on the basis of sex by complaining that Dr. Page received credit for publishing in a certain business journal while Plaintiff did not receive credit for publishing in the same journal.  Because Dr. Page is *female*, I am bewildered by Plaintiff's reliance on this irrelevant fact.

Second, Plaintiff identifies various male evaluators who opine that they themselves are not qualified to be full professors.  Plaintiff questions whether these evaluators should have been permitted to evaluate her application.  The belief by a male faculty member that he himself does not "measure up" to the qualifications of a full professor *strengthen*, rather than weaken, the inference that his decision to reject Plaintiff's application for promotion was based on the legitimate and non-discriminatory reason that attaining full professor status is difficult to achieve.

Third, Plaintiff relies on the decline in positive evaluations by several male faculty members between 2003 and 2004 to support her claim of discrimination.  Again, I fail to comprehend the relevance.  That male faculty members evaluated Plaintiff positively with "good" and "outstanding" marks in 2003, but then rated her "good," "average," "below average," or had "insufficient information" with which to evaluate her in 2004 does not demonstrate that they discriminated against Plaintiff on the basis of her sex.  Indeed, the fact that male faculty members evaluated Plaintiff *positively* rather than negatively in 2003, suggests that discrimination based on sex did <u>not</u> occur.  It was Plaintiff who *voluntarily withdrew* her application for promotion in 2003, despite those positive evaluations.  Thus, Plaintiff's allegation that the 2003-2004 evaluations were part of an overall scheme or conspiracy to discriminate against her is illogical, for absolutely no evidence suggests that the evaluators who rated Plaintiff positively in 2003 were even aware that Plaintiff would unilaterally withdraw her application so as to provide them with another opportunity to evaluate her in 2004.

According to these male faculty members, their evaluations of Plaintiff declined in 2004 because "the message was not getting through" that Plaintiff lacked the

qualifications necessary for promotion.  Plaintiff contends that

> It does not take a genius to determine that they conferred amongst each other to come up with their 'communicating a message' testimony.  It can be devastating to an applicant for full professor to receive any rating by a peer that is below average.  This is particularly true of Dr. Platt's overall below average ranking.   It is particularly ironic that these low evaluations came from associate professors, two of which do not consider themselves worthy of promotion to full professor. These incredible evaluations placed a 'taint' on the promotion process from the outset.

(Doc. 55:11.)  Again, it is not my function to determine whether the faculty members conferred with each other; whether the evaluators are associate professors who do not consider themselves worthy of promotion to full professor; whether the evaluations "tainted" the promotion process; or whether the evaluations themselves were inaccurate or even arbitrary.  These allegations question the fairness and honesty of the promotional process and essentially ask me to decide whether Plaintiff was black-balled.

Whether employees harbor personal ill-will or animus toward another employee is not a question that is properly before me.  Under Title VII, my jurisdiction is limited to determining whether the evidence permits an inference that Plaintiff was discriminated solely on the basis of her sex.  I answer that question in the negative for the following reasons:

1. Plaintiff has failed to demonstrate that she was qualified for the promotion;

2. Plaintiff has failed to establish that a similarly situated male was promoted to full professor;

3.  the University has articulated legitimate, non-discriminatory reasons for rejecting Plaintiff's application for promotion; and

4. Plaintiff has failed to demonstrate that the reasons articulated by the University for rejecting the application are pretexts for discrimination.

I therefore find it proper to grant the University's motion for partial summary judgment on Plaintiff's failure to promote claim.

**C.  Discriminatory Pay**

The University next seeks summary judgment on Plaintiff's claim that the University discriminated against her on the basis of sex by paying her less than her male counterparts.  Plaintiff's response to the motion clarifies that her discriminatory pay claim is brought pursuant to the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and not pursuant to Title VII, although a claim of discriminatory pay is actionable under both statutes.[2]  See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1526-27 (11th Cir. 1992) (noting that Title VII "supplements, rather than supplants," the EPA and acknowledging that the EPA may be more plaintiff-friendly than Title VII).

The EPA "forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex."  Id.  Under the EPA's relevant statutory language,

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

Thus, "[t]o establish a prima facie case under the [EPA], a complainant 'must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"  Miranda, 975 F.2d at 1532 (quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S. Ct. 2223, 2228, 41 L. Ed. 2d 1 (1974)).  "Once a plaintiff [establishes] a prima facie case, the burden shifts

---

[2]Plaintiff's response analyzes the failure to promote claim under Title VII and the discriminatory pay claim only under the EPA.

to the employer to prove that the difference in pay is justified by one of the four exceptions in the [EPA]: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." Miranda, 975 F.2d at 1532 (quoting Corning Glass Works, 417 U.S. at 196, 94 S. Ct. at 2229).

Unlike Title VII which requires a showing of discriminatory intent on the part of the defendant, "[t]he [EPA] prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins." Id. at 1532.

### 1. Substantially Similar/Equal Jobs

To establish a prima facie case under the EPA, "[t]he jobs held by the employees of opposite sexes need not be identical; rather, they need only be substantially equal" in skill, effort, and responsibility. Miranda, 975 F.2d at 1532 (citing Corning Glass Works, 417 U.S. at 203-04, 94 S. Ct. at 2232-33). The "substantially equal" requirement, however, is a "fairly strict standard." Miranda, 975 F.2d at 1526. In determining whether the jobs are "substantially equal," the focus is not on the unique skills and qualifications of the employees holding a particular job but on the requirements and characteristics of the *job* itself. Id. at 1532 (citing Brock v. Georgia Southwestern College, 765 F.2d 1026, 1032 (11th Cir. 1985)). "Because at this stage the jobs and not the employees are compared, only the skills and qualifications actually needed to perform the jobs are considered." Miranda, 975 F.2d at 1532. In addition, "[a]lthough job titles are entitled to some weight in this evaluation, 'the controlling factor under the [EPA is job content' - the actual duties that the respective employees are called upon to perform." Id. (citing Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1049 (5th Cir. 1973), cert. denied, 414 U.S. 822, 94 S. Ct. 121, 38 L. Ed. 2d 55 (1973)).

Plaintiff identifies several male assistant and associate professors whom she contends are employed in positions substantially equal to hers but who earn higher salaries than Plaintiff. The first question that must be answered is whether the positions

held by these faculty require skill, effort, responsibility, and working conditions equal or substantially similar to those required by Plaintiff's position.

In answering this question, I examine the attributes of the College of Business at UWF.  The College of Business is accredited by the Association to Advance Collegiate Schools of Business ("AACSB"), the premier accrediting agency in the nation for bachelor's, master's and doctoral degree programs in business administration and accounting.  The College of Business is comprised of three departments: the Departments of Accounting/Finance; Management/Management Information Systems; and Marketing/Economics.  Plaintiff is employed in the Department of Management/Management Information Systems ("DM/MIS").  The DM/MIS incorporates three general fields: Management Information Systems ("MIS"), Management Science ("MS"), and Strategic Management ("SM").  These fields are further comprised of the following eight specific subject areas: human resources, management, management information systems, management science, operations management, organization behavior, strategic management, and organizational development.

The accrediting process requires that a faculty member possess the qualifications, academic preparations, research achievements, expertise, and/or experience in the field and subjects that she is hired to teach.  Thus, a professor's academic qualifications and expertise are inherently inseparable from the duties and skills required of the job.  This case then is properly distinguishable from the factual scenario in Mulhall v. Advance Sec., Inc., 19 F.3d 586, 594 (11th Cir. 1994).  The Mulhall court found it irrelevant that the comparator had an accounting degree and the plaintiff did not  because the actual job positions themselves did not require an accounting degree.  The fact that the comparator had the degree and the plaintiff did not had no bearing on whether the positions were substantially equal.

Here, however, degrees and education are intrinsic to the qualifications of a university professor.  A university professor may only teach the subjects for which she possesses the requisite knowledge and expertise.  Plaintiff's doctorate is not in a business field; rather, her doctorate is in the field of education (Ed.D.).  Plaintiff does not

hold a doctor of philosophy degree in business (Ph.D.).  Plaintiff's Ed.D., master's degrees, and experience only qualify her to teach the following subjects: human resources, management, and organization behavior.  These subjects are the "softer," more people-oriented business courses and are consistent with Plaintiff's background in psychology, education, and human resources.  Further, Plaintiff teaches the foundational, introductory-level courses in those subject areas.

Obviously, the salaries of faculty who teach the "softer," foundational business courses are lower than the salaries of professors with more specialized expertise in the computer, scientific, and mathematical areas of business.  Within Plaintiff's department, these more specialized areas include management information systems, operations research/management science, strategic management, and operations management.

The area of management information systems requires highly specialized knowledge and proficiency in computer systems analysis, design, development, and programming.  The area of operations research/management science incorporates mathematical models and quantitative techniques to assist in managerial decision making.  Topics covered in an operations research/management science course include linear programming, network optimization, integer programming, goal programming, and queuing models.

The strategic management course is a capstone class offered only after students have completed the foundational courses.  The course integrates all management fields including accounting, finance, economics, and marketing.  Its purpose is to develop strategies and objectives for business organizations, develop policies and plans to achieve those objectives, and allocate resources to implement those policies and plans. It requires the most sophisticated level of managerial activity, usually performed by an organization's chief executive officer and executive team.

Finally, the operations management courses focus on planning and managing the operations of a business.  Covered topics include productivity, project management, forecasting, design of goods and services, managing quality, statistical process control, capacity planning, supply chain management, inventory management, and material

requirements planning.

The record is undisputed that, unlike Plaintiff, each of the comparators identified by Plaintiff holds a Ph.D. or a doctorate in business administration and is qualified to teach in the more specialized areas of business.  Thus, the comparators are not employed in positions which require equal skill, effort, and responsibility, and which are performed under similar working conditions as Plaintiff's position.  Plaintiff does not dispute that she lacks the knowledge, experience, and expertise required to teach the specialized business classes.

This scenario is comparable to that existing in other fields.  In the medical field, for example, specialists typically earn more than generalists.  Obviously, a neurosurgeon can expect to earn more than a general practitioner.  Plaintiff improperly seeks to disregard the differences in education and expertise between herself and her purported comparators.  Plaintiff's position as a foundational instructor qualified to teach the softer business subjects does not require the same or substantially similar skill, effort, responsibility, and working conditions as those of her purported comparators who hold Ph.D. degrees and who are qualified to teach the more specialized business subjects.

### 2.  "Factors Other Than Sex" Influencing Pay

Even if Plaintiff has established a prima facie case under the EPA, I find that the University has proven by a preponderance of the evidence that any difference in pay is justified by "factor[s] other than sex."  Miranda, 975 F.2d at 1532 (quoting Corning Glass Works, 417 U.S. at 196, 94 S. Ct. at 2229).  The factors include:  (1) field of expertise and degree; (2) market rate and inversion; and (3) rank and promotion.

### a. Field of Expertise and Degree

The University has proven that any difference in Plaintiff's compensation relative to the compensation of male faculty members can be justified, in part, by Plaintiff's field of expertise and degree.  The record indicates that across the nation and at the University, faculty with expertise in management information systems, management systems, operations management, and strategic management command higher salaries

than faculty whose expertise is limited to the softer, foundational areas of business - human resources, management, and organization behavior.

Further, business faculty at the University and across the country who hold Ph.D. degrees or doctorates in business generally earn more than business faculty who hold Ed.D. degrees.  An Ed.D., a doctor of education, is a degree in education and not a business degree.  An Ed.D. is thus a degree that is out-of-field.

The Equal Opportunity Commission has stated that "[e]mployers can offer higher compensation to applicants and employees who have greater education, experience, training, or ability where the qualification is related to job performance or otherwise benefits the employer's business." EEOC Compliance Manual, Section 10-IV(F)(2)(a). Here, the record indicates that the University benefits by offering higher salaries to faculty with expertise in the more specialized areas of business because such faculty members are scarce.  Thus, Plaintiff's field of expertise and degree both contribute to her lower salary.

### b. Market Rate and Inversion

Also contributing to Plaintiff's lower salary is the current market in business education.  Across the nation and at the University, business faculty who are hired today command much higher salaries than business faculty who were hired in 1989, the year in which Plaintiff was hired, even when the salaries are adjusted for inflation.  This phenomenon that new hires in the field of higher business education earn more than established faculty is called "inversion" or "compression."

Plaintiff was hired in 1989 at a salary of $39,000 and earned $64,426 in 2003.  In comparison, a female business faculty member with a Ph.D. hired in 2003 to teach management information systems and operations management earned a starting salary of $87,000.  Although this was a *starting* salary, it was the highest salary earned by *any* faculty member, male or female, in Plaintiff's department, including those earned by professors who had taught at the college for decades.  In fact, this starting salary was higher than the $78,862.50 adjusted salary of the department *chair* himself.

The evidence indicates that inversion is caused by market forces, particularly, the

scarcity of graduates in the business field with Ph.D. degrees.  Approximately 1,100 Ph.D. degrees in business are awarded each year.  This number is less than half the number required to fill positions in U.S. business schools.  The facts demonstrate that new graduates with Ph.D. degrees in business are aggressively recruited by the corporate sector, which lulls graduates away from academia by offering them substantial salaries.  An imbalance in supply and demand of business professors is created and increases the market value of new hires.[3]  Plaintiff ignores the current market in her field and improperly compares her salary to more recent hires.

### c.  Rank and Promotion

Plaintiff contends that her claim of discriminatory pay is also supported by the higher pay earned by several assistant professors relative to her compensation as a higher-ranked associate professor.  However, the record demonstrates that inversion applies regardless of rank.  In other words, a person hired today at the rank of assistant professor will generally earn a higher starting salary than an associate or even a full professor who has been employed at the University for many years.  For example, when Dr. Mukherjee was promoted from associate professor to full professor, his salary jumped from $69,944 to $78,830.  This was still less than the salary of an *assistant* professor, and a female one at that, hired in 2003 at a starting salary of $87,000.

In 2003, University records indicate that there were six full professors, four associate professors, and five assistant professors employed by Plaintiff's department.  Interestingly, three of the four assistant professors earned more than any of the four associate professors even though an associate professor is a higher rank than an assistant professor.  Even more fascinating, three of the four assistant professors earned more than three of the five *full* professors even though a full professor is two

---

[3]I note that inversion as a "factor other than sex" differs from another variety of market force which has been specifically rejected by the Supreme Court.  <u>See</u>, <u>e.g.</u>, <u>Glenn v. General Motors Corp.</u>, 841 F.2d 1567, 1570 (11th Cir. 1988) (citing cases rejecting the market force theory that a woman's willingness to work for less than a man is a valid consideration under the [EPA]).  Inversion has no relationship to the sex of a person; rather, it applies to all faculty, new and established, male and female.

ranks above an assistant professor.

To further illustrate the power of inversion on Plaintiff's salary, a male faculty member, Dr. Roberts, was hired in 1969, holds a Ph.D. in business, and served ten years as department chair.  Despite these qualifications, Dr. Roberts earned only $6,000 more than Plaintiff's starting salary in 1989, even though Dr. Roberts had been employed at the University *twenty years* longer than Plaintiff.  Plaintiff's contention that discrimination in pay is illustrated by the higher pay earned by male assistant professors relative to her pay is clearly unsupported.

The Supreme Court has stated that "[u]nder the EPA, the courts and administrative agencies are not permitted to 'substitute their judgment for the judgment of the employer . . .' so long as it does not discriminate on the basis of sex."  County of Wash. v. Gunther, 452 U.S. 161, 170-71, 101 S. Ct. 2242, 2248-49, 68 L. Ed. 2d 751, 760 (1981).  Examining the figures, I find that the University has satisfied its burden of proving that any difference in Plaintiff's salary can be justified by a factor other than sex.  While no individual factor, taken in isolation, is necessarily dispositive, the factors identified by the University, taken as a whole, conclusively explain why Plaintiff earns less than the male counterparts whom she identifies.

In summation, Plaintiff has failed to establish a meritorious claim under the EPA for the following reasons:

1.  Plaintiff has failed to establish a prima facie case under the EPA.  She has not demonstrated that the University pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions;

2.  The University has demonstrated that the following factors other than sex can account for any differences in pay earned by Plaintiff relative to her male counterparts:

        a. Plaintiff teaches foundational, introductory, soft business classes;

        b. Plaintiff is not qualified to teach the more specialized business classes;

        c. Plaintiff's doctorate is in the field of education and not a doctorate in the

field of business; and

        d. Plaintiff's salary is influenced by the market phenomenon of inversion which explains why her salary is lower than the salaries of more recent hires.

**D.  Plaintiff's Claims Under Title VII, FCRA, Title IX, and FEEA**

      I have previously granted partial summary judgment in favor of the University and dismissed with prejudice Plaintiff's claims under Title IX and the FEEA on legal principles.  I now find that all claims asserted by Plaintiff under Title VII, FCRA, Title IX, FEEA, and EPA also require dismissal on their merits for the reasons enunciated in this opinion.  Plaintiff has failed to support her claims as a matter of law that the University discriminated against her on the basis of sex in (1) its denial of Plaintiff's request for promotion and (2) its compensation of Plaintiff.

## III.  CONCLUSION

1.  Defendant's Motions for Partial Summary Judgment on Plaintiff's Failure to Promote Claims and Discriminatory Pay Claims (Docs. 38 & 39) are **granted**.

2.  The clerk is directed to enter judgment dismissing Plaintiff's claims **with prejudice.**

3.  The clerk shall close the file.

      **ORDERED** on July 13, 2007.

                    /s/ Richard Smoak
                    **RICHARD SMOAK**
                    **UNITED STATES DISTRICT JUDGE**